STATE OF NEBRASKA, APPELLEE, V.
MICHAEL MEEHAN, APPELLANT.
565 N.W. 2d 459

Filed September 15, 1998.    No. A-97-361.

Richard K. Watts, of Mills, Watts & Nicolas, for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

MILLER-LERMAN, Chief Judge, and IRWIN and SIEVERS, Judges.

MILLER-LERMAN, Chief Judge.

The State sought and was granted a rehearing before this court following the filing of our opinion found at *State v. Meehan*, 6 Neb. App. 616, 576 N.W.2d 483 (1998). Upon rehearing, the opinion found in that previous filing is withdrawn and superseded in its entirety by this opinion. The reversal of Michael Meehan's conviction for subornation of perjury found in that previous filing is expressly overruled by this opinion, and we hereby affirm all of the charges of which Meehan was convicted in the district court, including the charge of subornation of perjury.

Following a bench trial, Michael Meehan appeals from his convictions and sentences imposed by the district court for York County. For the reasons recited below, we affirm Meehan's convictions in their entirety, and modify and affirm the sentences imposed upon him.

## PROCEDURAL BACKGROUND

On June 5, 1996, Meehan was charged by information with the following: count I, delivery of a controlled substance, in

violation of Neb. Rev. Stat. § 28-416 (Reissue 1995), a Class III felony; count II, conspiracy to deliver a controlled substance, in violation of Neb. Rev. Stat. § 28-202 (Reissue 1995) and § 28-416, a Class III felony; count III, bribery of a witness, in violation of Neb. Rev. Stat. § 28-918 (Reissue 1995), a Class IV felony; count IV, tampering with a witness, in violation of Neb. Rev. Stat. § 28-919 (Reissue 1995), a Class IV felony; count V, subornation of perjury, in violation of Neb. Rev. Stat. § 28-915 (Reissue 1995), a Class III felony; and count VI, theft by deception in an amount of more than $200 but less than $500, in violation of Neb. Rev. Stat. § 28-512 (Reissue 1995), a Class I misdemeanor. Meehan pled not guilty to the charges.

On August 21, 1996, Meehan moved for an order electing separate trials on the various counts. Ultimately, two bench trials were had in this case: one trial, held September 11 and 12, 1996, on counts I and II; and a separate trial, held on February 5 and 6, 1997, on counts III through V. Meehan was convicted of counts I, III, IV, and V and appeals his convictions and sentences therefrom. Counts II and VI were dismissed and are not the subject of this appeal.

## FACTUAL BACKGROUND
*Delivery of Controlled Substance.*

Carla Schreiber has been employed as a narcotics officer with the Nebraska State Patrol since July 1994, working with various undercover operations in rural areas in Nebraska. Prior to meeting Meehan, Schreiber had received information from local law enforcement officers regarding Meehan's involvement with drugs. Schreiber testified that she first met Meehan on October 18, 1994, when she went to Meehan's residence in Waco, Nebraska, with a confidential informant, Terry Edmunds, to purchase methamphetamine. No sale of methamphetamine took place at this time.

Schreiber next met with Meehan at his residence on October 24, 1994, and asked him about the possibility of "finding me some stuff." Schreiber testified that Meehan asked her if, when she talked about "stuff," she was referring to crank. When Schreiber stated that that was correct, Meehan indicated that he was "supposed to get an eight ball but only got two grams. That he also thought he had a quarter coming." Schreiber explained

that an "eight ball" was an eighth of an ounce of methamphetamine and stated that a "quarter" was a "quarter gram of methamphetamine." Schreiber stated that these were terms commonly referred to by persons involved in drug trafficking. Schreiber did not obtain drugs from Meehan at this time.

Schreiber again met with Meehan at his residence on November 4, 1994, at which time Meehan told Schreiber that he thought he could get her something. Schreiber could not recall who first brought up the subject of drugs at this meeting.

On the evening of November 9, 1994, Schreiber stopped by Meehan's residence but discovered that he was not home. Because Schreiber was aware that Meehan frequented a local bar known as Hunter's Lounge, she went there to see if she might find Meehan. Meehan eventually arrived at the lounge and approached Schreiber, who was at the bar. Schreiber testified that during their conversation, Meehan stated that he had gotten a quarter the previous night and then spoke of also getting an eight ball, of which there were a few grams left. Meehan also told Schreiber that he might be receiving methamphetamine later that evening from some people in York, Nebraska. Schreiber testified that they discussed fronting money for narcotics and talked about a "residence [sic]" in McCool Junction, Nebraska, being a supplier of cocaine. Schreiber said that Meehan spoke of being uncomfortable dealing with anyone that he had not known for 10 years, a statement which Schreiber described as having been made during a conversation about delivering methamphetamine to her or to other individuals. She testified that Meehan asked about going through Edmunds if Meehan felt uncomfortable about delivering to Schreiber. Schreiber said that the two conversed for about 2 hours, during which time she brought up the subject of Meehan's obtaining methamphetamine once or twice. Schreiber acknowledged that she told Meehan that she was working on her house and needed "motivation." Schreiber stated that Meehan may have brought up the subject of obtaining the drug numerous times during their conversation.

Later that evening, after the two had left the lounge, Schreiber arrived at Meehan's home. Schreiber testified that Meehan opened the door and said, "I got two lines together, I

scraped some bags," and indicated that Schreiber should follow him up the stairs. Schreiber explained that "two lines" referred to two lines of methamphetamine and that "scraped some bags" meant that Meehan had scraped the residue from a bag that had contained methamphetamine in the past. Schreiber stated that there were two lines of an off-white powdery substance on a granite-type block located upstairs in Meehan's house. Meehan suggested that Schreiber "snort" one line, and then he left to find some paper in which Schreiber could take home the other line. Schreiber testified that when Meehan left the room, she brushed one line onto the floor and that after Meehan returned with some paper, she brushed the other line into it, folded it up, and placed it in her pocket. Eventually, this substance was sent to the Nebraska State Patrol Criminalistic Laboratory and was determined to be methamphetamine. Schreiber testified that a number of people smoked marijuana at Meehan's house on the night she obtained the methamphetamine.

At trial, Meehan moved to dismiss count I, asserting the defense of entrapment. The trial court overruled Meehan's motion.

*Subornation of Perjury.*

On June 23, 1995, Dan Klimek and Dan Bartling, drug investigators with the Nebraska State Patrol, went to Meehan's house in Waco to serve a search warrant. Meehan was home at the time, as was Lee Smith, who was staying with Meehan. Smith was arrested after the officers found a white, powdery substance in a container in her purse. In a desk located in a bedroom, officers found, among other things, a spoon with a white powdery substance on it and two boxes of plastic baggies. Meehan and Smith were both arrested for and charged with possession of a controlled substance. It later became a subject of dispute as to whether the powdery substance on the spoon, later determined to be methamphetamine, belonged to Meehan or to Smith.

Schreiber testified that she spoke with Meehan on October 19, 1995. She stated that the impression she received from her conversation with Meehan was that Meehan's then-lawyer and Smith's lawyer had come up with a scheme whereby, with Meehan's cooperation, they would attempt to get evidence related to Smith suppressed and, in turn, Smith would testify at Meehan's trial that all of the drugs in Meehan's house were hers.

Gary Harre testified that Smith came to live with him after she posted bond following her arrest at Meehan's home. Harre stated that Meehan told Harre that Meehan wanted to speak with Smith about her taking responsibility for all of the drugs found at Meehan's residence.

Smith testified that she was jailed for approximately 30 days following her arrest before she was released on bail. She said that she stayed with Harre for several weeks and was then rearrested for violation of her bond. Smith testified that Meehan visited her while she was in jail and that he attempted to persuade her to say that all the drugs were hers. Smith testified that before she returned to jail, she visited with Meehan's lawyer, who explained to her that if the evidence in her case was suppressed, the charges against her would be dropped, and that if she later testified in Meehan's trial that the drugs were hers, no further charges could be brought against her, because double jeopardy would have attached.

Smith testified that on October 18, 1995, her court-appointed attorney visited her in jail and told her that Meehan's attorney was also at the jail with a court reporter. According to Smith, her lawyer told her that Meehan's lawyer had guaranteed that if she made a statement that the drugs were hers, she would be bonded out of jail within the hour. Smith's statement, made before a court reporter/general notary public, is part of the record in this case. The unsigned statement is 32 pages long. It is in the form of questions posed by the lawyers for Meehan and answered by Smith. There is no case caption on the statement. However, reference to both the criminal cases against Smith and Meehan is made in the statement. In the statement, Smith swore to tell the truth. In the statement, Smith stated, inter alia, that the methamphetamine found on the spoon in Meehan's house was hers.

Smith testified at trial that she was released from jail about one-half hour after giving her statement to Meehan's lawyer. She further testified that her statement that all the methamphetamine was hers was not true but that she had said it to get out of jail. Smith stated that in February 1996, she disclosed the scheme to Charles Campbell, the York County Attorney, during a meeting she had with Campbell regarding another case.

Meehan's mother, Charlene Meehan, testified that she did not know Smith but that Meehan's lawyer told Charlene and her husband that they should post a $2,000 bond for Smith. Charlene said that the lawyer told her and her husband that he planned to take a sworn statement from Smith the following day. Charlene testified that the lawyer told them he would call them when he had the statement and that he, in fact, did so. Charlene stated that on the lawyer's advice, they arranged for a third individual to actually post the bond with their money because the lawyer said that "it would look better this way."

At the time of trial, Meehan was represented by a different lawyer from the lawyer to whom reference is made above. Meehan's first lawyer, who was allegedly involved in the purported scheme, testified at Meehan's trial that there was no connection between the posting of Smith's bond and her statement given shortly beforehand. This lawyer denied being part of a plan to influence Smith's testimony by posting or arranging her bond.

Also testifying at Meehan's trial was the lawyer who defended Smith at the suppression hearing in the separate case against her. This lawyer testified that he could not recall meeting with Smith at the jail shortly before she gave her statement. However, he acknowledged that his signature appeared on the jail log of visitors for that day, and he testified he was present when Smith's statement was taken. The lawyer admitted that he knew that Meehan's lawyer wanted to obtain Smith's statement before a court reporter and that he knew that the statement to be made by Smith would be very damaging to her. Smith's lawyer denied telling Smith that Meehan's lawyer said that she would be bonded out of jail that day if she made the statement.

The trial court found Meehan guilty of counts III through V. In connection with these findings, the court stated, in part, that it was convinced that there was a scheme or plan pertaining to Smith's testimony and that while the court was convinced that Meehan did not devise the plan, he was a willing and active participant in it.

*Sentencing.*

The presentence investigation report contained a synopsis of a statement given to the Lincoln Police Department by Bob

Radar, an acquaintance of Meehan's. At the sentencing hearing, Meehan objected to that part of the report being included in the presentence investigation report because he was not familiar with anyone named in the report, because the report was not the basis for any charge ever filed, and because he had not had the opportunity to confront Radar.

Meehan was sentenced as follows: on count I, not less than 2 nor more than 4 years' imprisonment; on count III, not less than 4 nor more than 5 years' imprisonment; on count IV, not less than 4 nor more than 5 years' imprisonment; on count V, not less than 6 nor more than 8 years' imprisonment. The sentences imposed in counts III, IV, and V are to be served concurrently with one another but consecutively to the sentence in count I. Meehan appeals.

## ASSIGNMENTS OF ERROR

Meehan claims that the trial court (1) erred in failing to find as a matter of law that the State failed to prove beyond a reasonable doubt that Meehan was predisposed to violate the law before the government induced him to do so; (2) erred in failing to find as a matter of law that the State failed to prove beyond a reasonable doubt that Meehan persuaded, procured, or suborned another person to make a false statement under oath or equivalent affirmation in an official proceeding; (3) abused its discretion in refusing to strike Radar's interview from Meehan's presentence investigation report and in considering the interview in connection with his sentencing; and (4) abused its discretion by imposing excessive sentences.

## STANDARD OF REVIEW

On questions of law, an appellate court has an obligation to reach independent conclusions irrespective of the decision made by the court below. *State v. Vidales*, 6 Neb. App. 163, 571 N.W.2d 117 (1997).

## ANALYSIS

*Entrapment.*

With regard to count I, delivery of a controlled substance, Meehan argues that the trial court erred in not finding that he was entrapped by the government to break the law. Meehan

asserts that there was no evidence presented by Schreiber or Edmunds that Meehan had a predisposition to deliver illegal drugs prior to Meehan's first contact with Schreiber and Edmunds on October 18, 1994.

In Nebraska jurisprudence, entrapment is " 'the governmental inducement of one to commit a crime not contemplated by the individual, in order to prosecute that individual for the commission of the criminal offense.' " *State v. Connely*, 243 Neb. 319, 330, 499 N.W.2d 65, 73 (1993), quoting *State v. Stahl*, 240 Neb. 501, 482 N.W.2d 829 (1992). Entrapment occurs when the criminal intent or design originates with governmental officials who implant in the mind of an innocent person the disposition to commit a criminal offense and who induce criminal conduct in order to prosecute the criminal offense induced. *State v. Connely, supra.*

Nebraska has adopted the "origin of intent" test to determine whether a defendant was entrapped. Under this test, the defendant was entrapped if (1) the government induced the defendant to commit the offense charged and (2) the defendant's predisposition to commit the criminal act was such that the defendant was not otherwise ready and willing to commit the offense on any propitious opportunity. *State v. Connely, supra*; *State v. Stahl, supra.* The ultimate focus of the "origin of intent" test is whether the defendant was predisposed to commit the crime. State *v. Connely, supra*; *State v. Stahl, supra.*

Entrapment is an affirmative defense, and thus the burden of going forward with evidence of governmental inducement is on the defendant. *State v. Connely, supra*; *State v. Stahl, supra.* Once a defendant satisfies his or her burden of producing sufficient evidence to raise an entrapment defense, the ultimate burden of proof is on the State to prove beyond a reasonable doubt that the defendant was not entrapped. *State v. Connely, supra*; *State v. Stahl, supra.*

In the present case, Meehan argues that in the course of Schreiber's contacts with him on October 18 and 24 and November 4, 1994, there is no evidence that Meehan expressed a willingness to deliver drugs to Schreiber or to Edmunds, and he notes that in fact, no drugs were delivered in the course of those contacts. On November 9, Schreiber searched for

Meehan, located him, and asked him one or two times whether he could obtain methamphetamine for her. Meehan asserts that he provided an extremely small amount of methamphetamine to Schreiber only after her repeated attempts to obtain the drug from him.

The Nebraska Supreme Court has, on several occasions, considered what type of evidence is relevant to demonstrate the predisposition of the defendant to commit a crime. That court has noted that a defendant's readiness and willingness to enter into the illegal transaction when asked to may be used to show predisposition. *State v. Parks*, 212 Neb. 635, 324 N.W.2d 673 (1982). The court has further noted that " 'ready access to illicit drugs is a legitimate factor . . . to consider on the question of predisposition.' " *State v. Connely*, 243 Neb. at 332, 499 N.W.2d at 74. " '[A] familiarity with and demonstrable orientation to the relevant activity also constitutes relevant evidence of predisposition.' " *Id.* In *Connely*, the defendant's knowledge of drug sale practices and command of the vernacular for the particular drug deal involved was also considered evidence of predisposition.

In the instant case, each of the above factors noted in *Parks* and *Connely* was present. There is evidence in the record that Meehan was ready and willing to enter into a drug transaction. He repeatedly assured Schreiber that he could obtain methamphetamine for her. Meehan spoke of drug contacts he had in York and of his knowledge of drug activity in the area, and he stated at one point that he had expected to get an eight ball but only got 2 grams. Schreiber observed people smoking marijuana at Meehan's house.

Meehan was clearly familiar with the traffic in methamphetamine and demonstrated familiarity with the drug sale practices and prices of the drug in the community. Meehan spoke in the vernacular of the drug trade. Based, inter alia, on the foregoing, there was adequate evidence upon which the district court could conclude that Meehan was predisposed to commit the crime for which he was charged and was not entrapped. Meehan's assignment of error is without merit.

*Subornation of Perjury.*

Meehan asserts that under the statutory language of § 28-915, he did not commit the offense of subornation of perjury.

Meehan's argument is that (1) because the statement given by Smith to Meehan's attorney on October 18, 1995, was not made in an official proceeding, it was not perjury and, therefore, Meehan did not suborn perjury and (2) because Smith retracted the false statement, it was not perjury and, therefore, Meehan did not suborn perjury.

Section 28-915, pertaining to perjury and subornation of perjury, provides:

> (1) A person is guilty of perjury, a Class III felony, if in any official proceeding he or she makes a false statement under oath or equivalent affirmation, or swears or affirms the truth of a statement previously made, when the statement is material and he or she does not believe it to be true.

> (2) A person is guilty of subornation of perjury, a Class III felony, if he or she persuades, procures, or suborns any other person to commit perjury.

> . . . .

> (5) No person shall be guilty of an offense under this section if he or she retracted the falsification in the course of the proceeding in which it was made before it became manifest that the falsification was or would be exposed and before the falsification substantially affected the proceeding.

As to Meehan's argument that Smith's retraction precludes his conviction for subornation of perjury, such argument fails under the statute by giving meaning to both § 28-915(1) and (5). Smith's statement was perjurious under § 28-915(1), but she was spared prosecution under § 28-915(5).

Neb. Rev. Stat. § 28-916.01(7) (Reissue 1995) defines an "official proceeding" as "a proceeding heard or which may be heard before any legislative, judicial, administrative, or other governmental agency or official authorized to take evidence under oath, including any referee, hearing examiner, commissioner, notary, or other person taking testimony or deposition in connection with any such proceeding."

The record shows without dispute that Smith's sworn statement was made at the York County jail in the presence of her attorney, Meehan's attorney, and the court reporter/general notary public. No representative of the State attended or was

notified that such a meeting was to take place. Although the statement itself does not bear a case caption, reference is made in the statement, inter alia, to the criminal case against Meehan. Following receipt of all the evidence, the trial court found that Smith's statement was made in "an official proceeding" as that term is used in §§ 28-915 and 28-916.01(7). Specifically, the trial court found that Meehan was an active participant in the plan to obtain the false statement of Smith for use in Meehan's pending criminal case. Where such finding is supported by the record as in the instant case, we will not substitute findings of fact for those of the trial court. *State v. Pierce*, 248 Neb. 536, 537 N.W.2d 323 (1995).

To be guilty of subornation of perjury, an individual must persuade, procure, or suborn another person to commit perjury. § 28-915(2). Perjury is a false statement made under oath in an official proceeding. § 28-915(1). An "official proceeding" is "a proceeding . . . heard before any legislative, judicial, administrative, or other governmental agency or official authorized to take evidence under oath . . . in connection with any such proceeding." § 28-916.01(7).

Under a plain reading of the foregoing statutes taken together, it is clear that for a statement to amount to perjury it must be false, made under oath, and made before any legislative, judicial, administrative, or other governmental agency or made before an official authorized to take evidence under oath "in connection with any such proceeding" as specified in § 28-916.01(7). Statutory language is to be given its plain and ordinary meaning. *State v. Brown*, 5 Neb. App. 889, 567 N.W.2d 307 (1997).

The proceedings specified in § 28-916.01(7) are listed as proceedings "heard before any legislative, judicial, administrative, or other governmental agency" or before an "official authorized to take evidence under oath . . . in connection with any such proceeding." The statement given by Smith was not made before any legislative, judicial, administrative, or other governmental agency. However, the statement given by Smith at the jail was sworn to before an individual authorized to take evidence under oath, and it was made in connection with a judicial proceeding, i.e., the pending criminal case filed against

Meehan. The trial court found the statement to be false, a finding amply supported by the record.

We note that a number of state statutes have liberalized, or even eliminated, the requirement that the false material sworn statement must be made in an official proceeding to amount to perjury. See, e.g., *Gargan v. State*, 805 P.2d 998, 999 (Alaska App. 1991) (referring to Alaska statutes "AS 11.56.200(a) and 11.31.110(a)"), *cert. denied* 501 U.S. 1209, 111 S. Ct. 2808, 115 L. Ed. 2d 981. However, in Nebraska, the official proceeding requirement for perjury remains the law in § 28-915(1).

It has been held, and we agree, that the "official proceeding" requirement must be affirmatively proved as an element of perjury. It has been stated:

> This construction of the statute [regarding official proceedings] is consistent with the realization that notaries public not only swear persons in connection with official proceedings but also notarize many sworn statements—affidavits, agreements, and the like—which are frequently not related to a pending legislative, judicial, administrative, or other government agency proceeding.

*Nessmith v. State*, 472 So. 2d 1248, 1253 (Fla. App. 1985). The Florida court continued: " '[A] proceeding is not made official by the formality with which it is conducted; instead, *its officiality depends on its purpose and the authority from which it derives.*' " (Emphasis in original.) *Id.* at 1254.

A review of the record in the instant case shows that the purpose for which Smith gave her statement was to state falsely under oath that all of the controlled substances found at Meehan's house were hers and that such statement was to be used in connection with the criminal proceedings pending against Meehan. A review of cases from other jurisdictions shows that where a false sworn statement is made for use in a pending judicial proceeding, it will be considered to have been given "in connection with" an official proceeding and, therefore, be considered perjurious. See, e.g., *State v. Jacobson*, 74 Wash. App. 715, 876 P.2d 916 (1994) (holding that affidavit containing false statement was made in official proceeding where affiant knew it would be used in pending litigation); *In re Drapp*, No. 93-L-069, 1994 WL 102237 at *5 (Ohio App. Mar.

4, 1994) (unpublished appellate opinion holding that false affidavit made to support new trial motion, although made in peripheral proceeding, was created " 'in connection with' " ongoing judicial proceeding); *People v. Chaussee*, 847 P.2d 156 (Colo. App. 1992), *modified* 880 P.2d 749 (Colo. 1994) (holding that false interrogatory answers were made in official proceeding where case upon which interrogatories were based was pending). Where there is no pending case, false statements under oath are not necessarily deemed perjurious. See, e.g., *Commonwealth v. Dawson*, 399 Mass. 465, 467, 504 N.E.2d 1056, 1058 (1987) (false sworn statements given during police investigation were not given in " 'proceeding in a course of justice' "); *State v. Adkins*, 553 So. 2d 294 (Fla. App. 1989) (holding in trafficking in stolen vehicles case that notarized statement prepared to obtain certificate of title for motor vehicle was not made in official proceeding and, therefore, not perjury); *Nessmith v. State, supra* (holding that where no claim for wage loss benefit had been filed in workers' compensation case at time sworn statement made in deposition, statement not made in official proceeding); *Schramm v. State*, 374 So. 2d 1043 (Fla. App. 1979) (holding that interrogation conducted by police at police station not conducted in official proceeding).

In the instant case, there was ample evidence to establish that the statement given by Smith was false, was material, and was intended to be used in connection with the criminal case pending against Meehan. Meehan's role in procuring the statement is supported by the record, as the trial court found.

Although the meeting which took place at the jail was not an official proceeding, the false statement made by Smith was made in connection with the criminal proceeding pending against Meehan, as the trial court found. Notwithstanding her recantation, Smith's statement was properly construed as perjury under § 28-915(1), and Meehan, in turn, suborned perjury. Accordingly, we affirm Meehan's conviction and sentence on count V, subornation of perjury.

*Radar's Statement and Meehan's Sentences.*

Meehan objects to the inclusion of a statement by Radar, an acquaintance of Meehan's, in Meehan's presentence

investigation report. The report generally dealt with Radar's contact with Meehan prior to the instant case. A sentencing court has broad discretion in the source and type of evidence that it may use in determining the kind and extent of punishment to be imposed within the limits fixed by statute. *State v. Schmidt*, 5 Neb. App. 653, 562 N.W.2d 859 (1997). It has specifically been held that a sentencing court in noncapital cases may consider a defendant's nonadjudicated misconduct in determining an appropriate sentence. *Id.* In any event, the record does not reflect that Meehan was prejudiced by the inclusion of Radar's statement. Meehan's assignment of error regarding Radar's statement is without merit.

Meehan was convicted of two Class III felonies, counts I and V, for which the penalty as to each is a maximum of 20 years' imprisonment, a $25,000 fine, or both, and a minimum of 1 year's imprisonment. See Neb. Rev. Stat. § 28-105 (Reissue 1995). Counts III and IV are Class IV felonies, for which the penalty at the time of Meehan's conviction and sentencing by the trial court was a maximum of 5 years' imprisonment, a $10,000 fine, or both, with no minimum punishment. See *id.* We note that § 28-105 was amended by the Legislature in 1997. Operative July 1, 1998, Class IV felonies are now punishable by a mandatory minimum term of 6 months' imprisonment; the maximum punishment has not been altered. Meehan was sentenced to 2 to 4 years' imprisonment on count I. Consecutive to count I, Meehan was sentenced to 4 to 5 years' imprisonment on count III, 4 to 5 years' imprisonment on count IV, and 6 to 8 years' imprisonment on count V, to be served concurrently with each other.

The sentences imposed by the trial court were all within statutory limits in effect at the time of sentencing. A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. Aguirre-Rojas*, 253 Neb. 477, 571 N.W.2d 70 (1997).

After Meehan was sentenced, amendments to some Nebraska statutes became operative which impact Meehan's sentences. When a criminal or penal statute is amended after the commission of a prohibited act but before a final judgment is rendered and the effect of the amendment is mitigation of the punish-

ment, the terms of the amendatory act control the punishment, unless the Legislature has specifically provided otherwise. *State v. Groff*, 247 Neb. 586, 529 N.W.2d 50 (1995); *State v. Randolph*, 186 Neb. 297, 183 N.W.2d 225 (1971), *cert. denied* 403 U.S. 909, 91 S. Ct. 2217, 29 L. Ed. 2d 686. This rule applies when the statutory amendment becomes operative during the pendency of an appeal, because a sentence is not a final judgment until the entry of the final mandate of an appellate court. *Jones v. Clarke*, 253 Neb. 161, 568 N.W.2d 897 (1997); *State v. Schrein*, 247 Neb. 256, 526 N.W.2d 420 (1995).

The amendment to Neb. Rev. Stat. § 29-2204 (Supp. 1997), which became operative July 1, 1998, necessitates our modification of Meehan's sentences for the Class IV felonies. As amended, § 29-2204(a)(i) provides, inter alia, that when an indeterminate sentence is imposed for a Class IV felony, the minimum term of incarceration fixed by the court "shall not be . . . more than one-third of the maximum term . . . ." Meehan was convicted of two Class IV felonies, and an indeterminate term of 4 to 5 years' imprisonment was imposed for each sentence. Following the amended terms of § 29-2204, the minimum portion of Meehan's sentence for each of these Class IV felonies must be modified so that, in each instance, it does not exceed one-third of the maximum term of imprisonment. Therefore, we modify the minimum term of each of these Class IV felonies, i.e., counts III and IV, to 20 months, which is one-third of the 5-year maximum term prescribed by statute and imposed by the trial court.

In sentencing Meehan, the trial judge focused on Meehan's prior criminal record and noted that his course of conduct dealt with the use and abuse of drugs and making drugs available to other people. Given the extent and history of Meehan's involvement as a supplier of controlled substances, not repeated here, the trial judge's comments and reasoning were appropriate. As modified, the sentences imposed are within the present statutory limits, and we find no abuse of discretion.

## CONCLUSION

We affirm Meehan's convictions and modify his sentences.

AFFIRMED AS MODIFIED.